## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **PAULSON PRV HOLDINGS LLC; EARLE HC LLC;** | |
| **Plaintiffs,** | |
| **v.** | **CIVIL NO.** |
| **BETTER PUERTO RICO LLC AND FAHAD GHAFFAR;** | **TRIAL BY JURY DEMANDED** |
| **Defendants.** | |

## COMPLAINT

**TO THE HONORABLE COURT:**

COMES NOW the plaintiffs, Paulson PRV Holdings LLC ("Paulson PRV") and Earle HC LLC ("Earle") (hereinafter jointly referred to as "Plaintiffs"), by and through the undersigned counsel, hereby respectfully ALLEGE, STATE and PRAY:

### I.      INTRODUCTION

Defendant Fahad Ghaffar's ("Fahad") shameless efforts to exploit the trust and connections provided to him by his former employer, Mr. John Paulson ("Mr. Paulson") are now well-known. Before his association with Mr. Paulson, Fahad languished in obscurity as a small-time commercial real estate investor, with little to no prospects to speak of. Mr. Paulson gave him a job, took him under his wing and gave him an opportunity to provide for himself and his family. Regrettably, Fahad was a snake in the grass—a figure of extraordinary greed and corruption. After gaining Mr. Paulson's trust, Fahad ascended to a position overseeing Mr. Paulson's investments in Puerto Rico. Fahad then revealed his true nature and intentions, the more egregious examples of which are detailed extensively in the case of *Paulson PRV Holdings LLC, et al. v. Fahad Ghaffar, et al.*, 23-cv-1521 (SCC).

This action seeks damages stemming from yet another instance of fraud perpetuated by Fahad upon Mr. Paulson and his associated entities, Paulson PRV and Earle, in relation to the development of a luxury high-rise condominium that came to be known as The Vanderbilt Residences ("VBR" or "the Project"). Fahad took advantage of the influence and authority Mr. Paulson had bestowed upon him, and he ensured that all information related to the Project was funneled through him before reaching Mr. Paulson. This allowed him to manipulate, distort, and falsify information to fraudulently induce Mr. Paulson to agree to allow Fahad to invest jointly with him in the development of the VBR, ultimately resulting in Fahad, through one of his associated entities, obtaining a 44% economic stake in the profits of the Project.

In 2014, Plaintiff Paulson PRV Holdings formed Earle to acquire a parcel of land located at 1149 Ashford Avenue, an enviable beachfront lot in the heart of Condado, Puerto Rico, one of the highest-income areas on the island. Mr. Paulson's goal and vision with this project was to develop an ultra-luxury condominium once the market conditions on the island improved.

In or around 2018-2019, Paulson PRV reviewed the economic feasibility of developing the project. Although market conditions had improved since 2014, the market prices for condominium units could not support the costs associated with a construction project of this scale—a 26-story, 79-unit luxury building.

In 2021, Fahad saw an opportunity to exploit his relationship with Mr. Paulson and the trust deposited in him to get rich. He viewed the lot as his golden ticket, and he devised a scheme to get Mr. Paulson to allow him to coinvest in the Project. To that end, citing purportedly improved market conditions, Fahad approached Mr. Paulson regarding the Project. Fahad perceived Mr. Paulson's hesitancy and assured Mr. Paulson that he would thoroughly analyze the financial prospects of the development. He ordered several of his underlings at Paulson PRV to prepare a budget and financial forecast for the Project. When Fahad received the financials, they were not

what he had hoped for and Fahad knew Mr. Paulson would not be persuaded to invest in those forecasted conditions. Undeterred, Fahad grossly and intentionally understated both the true costs and timeline to secure Mr. Paulson's approval. Specifically, Fahad caused the costs to be artificially reduced by 10% in the presentation that would be provided to Mr. Paulson, thus deliberately misleading Mr. Paulson about the Project's budget. Fahad also falsely stated that the Project would be substantially completed within 34 months. Based on these false projections, and because he understandably trusted the good faith and judgment of his highest-ranking Puerto Rico-based employee, Mr. Paulson gave the green light to break ground on the TVR.

Fahad's scheme was not yet complete. He still needed to convince Mr. Paulson to allow him to join as a "co-investor", not just an employee. To achieve this, he resorted to more lies. Specifically, in 2022, Fahad used the grossly deflated project costs to prepare a budget forecast for the Project that would open the door for him to invest in the endeavor. Based on the falsely reduced cost forecast, Fahad assured Mr. Paulson that 93% of the costs would be covered through proceeds from the sale of tax credits and deposits from future buyers, leaving only 7%—or $11 million—to complete construction. Fahad offered to personally cover that $11 million shortfall and enter the Project as a co-investor. Mr. Paulson placed his trust in Fahad's assurances and artificial financial projections and allowed Fahad to invest in the Project. Fahad then caused one of his corporate entities, Better Puerto Rico LLC ("BPR"), to invest in the Project, resulting in BPR holding a 44% economic interest in Earle.

Fahad's deception was unsustainable. As the true costs of the TVR project began to surface, Fahad cut corners, hired unqualified vendors, and woefully mismanaged the construction, both to lower costs and out of sheer incompetence. In July 2023, Mr. Paulson, Earle, and Paulson PRV discovered the full extent of the damage his deception and mismanagement had caused and

3

removed Fahad from his positions at all entities affiliated with Mr. Paulson, including Paulson PRV and Earle. This action seeks to collect damages for Fahad's fraudulent inducement.

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action because this case sets forth violations of a federal statute, Section 10(b) of the Act and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*

2.    This Court also has jurisdiction to entertain the claims pleaded herein due to the existence of complete diversity of citizenship under 28 U.S.C. §§1332(a)(2). At the moment of filing this complaint, the amount of damages suffered by Plaintiffs exceeds $75,000.00, exclusive of interest and costs.

3.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred within this judicial district.

## III.    PARTIES

4.    Plaintiff Paulson PRV Holdings LLC is an LLC organized and existing under the laws of Delaware, but duly authorized to do business in Puerto Rico, with its principal place of business at 251 Little Falls Drive, Wilmington, New Castle, Delaware. Paulson PRV is engaged in the hotel industry and in real estate development and investments. Paulson PRV is a citizen of Delaware and New York, where its members are domiciled.

5.    Plaintiff Earle HC LLC is an LLC organized and existing under the laws of Puerto Rico. Earle's principal place of business is 221 Ponce De León Ave. Suite 500, 221 Plaza, San Juan, PR, 00907. Earle is engaged in the real estate development industry. Earle is a citizen of Delaware and New York because its only member is Paulson PRV, and Paulson PRV is a citizen of Delaware and New York, where its members are domiciled.

4

6.     Defendant Fahad Ghaffar is an individual who was born in Pakistan, moved to the United States, settled in Florida, moved to New York, and is now a resident of San Juan, Puerto Rico. He possesses a tax grant pursuant to Puerto Rico Act No. 22-2012, P.R. Laws Ann. tit. 13, § 10851 *et seq*.

7.     Defendant Better Puerto Rico LLC is a limited liability company organized and existing under the laws of Puerto Rico, with the following physical and postal address: 954 Ave. Ponce de Leon, Miramar Plaza Ste. 505, San Juan, Puerto Rico, 00907. Upon information and belief, BPR's is a single-member limited liability company whose sole member is Fahad Ghaffar. Consequently, BPR is a citizen of Puerto Rico for jurisdictional purposes because Fahad is BPR's sole member and he is a resident of Puerto Rico.

## IV.    FACTS

***Fahad's relationship with Mr. John Paulson: from employee to manager.***

7.     Paulson & Co. Inc. ("Paulson & Co.") is a New York-based private investment firm founded and owned by Mr. John Paulson.[1] Paulson & Co.'s portfolio includes investments in various sectors, such as real estate, healthcare, technology, and natural resources. Its operations are characterized by a focus on generating outsized returns through strategic investments and market opportunities globally. Paulson & Co.'s investments span across the world, with a notable presence in Puerto Rico through its real estate ventures.

8.     Paulson PRV is a Delaware limited liability company with a single member, Paulson Management IV, LLC. The managing member of Paulson Management IV, LLC is Paulson Capital, Inc., an entity of Paulson & Co.

---

[1] Form 2004-2020, the firm was a registered advisor and management investor firm that managed billions of dollars in client assets, primarily known for its expertise in merger arbitrage and event-driven investing. The firm managed assets for institutional investors, including pension funds, endowments, and wealthy individuals. Since 2020, Paulson & Co.is exclusively a private investment office.

9.     Paulson PRV consolidates all of Paulson & Co.'s investments in Puerto Rico. Additionally, it acts as the managing member for most of those entities. These assets are often collectively referred to as "Paulson Puerto Rico."

10.     In 2013, Fahad, an unemployed small-time commercial real estate investor in Tampa, Florida, who was struggling to make deals, approached Mr. Paulson and begged for an opportunity to work for him, attracted by the chance to be part of a hugely successful business. Paulson was persuaded to offer Fahad a position as a junior analyst at Paulson & Co.

11.     As the years passed, Fahad continued to earn Mr. Paulson's trust and began to ascend to the point where he was effectively serving as the senior manager of Paulson's investments in Puerto Rico.

12.     Eventually, Paulson designated Fahad to be the person who oversaw all of Mr. Paulson's Puerto Rico-based investments—including the operations of various Paulson & Co. owned luxury hotels, such as the Condado Vanderbilt Hotel ("Vanderbilt"), La Concha Renaissance San Juan Resort ("La Concha"), and the St. Regis Bahia Beach Resort ("St. Regis").

13.     Understandably, Paulson trusted Fahad. That is the reason he tasked him with such a sensitive position overseeing his investments. Thus, when Fahad presented ideas and pitched investments to Paulson, Paulson assumed Fahad was doing so in good faith and with the best interest of Paulson's investments in mind.

14.     On the rare occasions that Paulson visited the island, Fahad monopolized his time, blocking other senior managers and employees from speaking with Paulson outside of his presence. This way he ensured he controlled all information shared.

15.     Fahad also took deliberate steps to prevent any Puerto Rico-based employees from directly communicating with the New York-based senior managers of Paulson & Co.

16.    Fahad demanded that all internal financial and corporate reports go through him first, allowing him to control what was communicated to upper management. This tight grip on communication and manipulation of financial data enabled Fahad to act without oversight in Puerto Rico, exploiting the entities he was entrusted to protect and exploiting Paulson's trust.

17.    As the result of years of severe misconduct by Fahad, which included acts of misappropriation, self-dealing, and fraudulent schemes aimed at personal enrichment, such as inflating service costs, diverting funds through shell companies, and misusing corporate assets for lavish personal expenses, Paulson terminated Fahad for cause and removed him from all operational responsibilities at Paulson-controlled entities on July 31, 2023.[2]

### Earle HC LLC and the Vanderbilt Residences Project.

18.    On May 28, 2014, Paulson PRV formed and organized Earle in accordance with the statutes and laws of the Commonwealth of Puerto Rico. On the same day, Paulson PRV executed the Limited Liability Company Agreement as the sole member of Earle, a limited liability company authorized to conduct business in Puerto Rico.

19.    Earle's Operating Agreement provides that new members may only be admitted with Paulson PRV's consent.

20.    Earle was first established to acquire a parcel of land located at 1149 Ashford Avenue in Condado, with the intention of developing it for future projects. On June 10, 2014, Paulson PRV, via Earle, purchased two adjacent parcels of land for $10,000,000.00.[3]

---

[2] These matters are currently being litigated in multiple forums, including the United States District Court for the District of Puerto Rico, where Paulson PRV Holdings LLC has filed a complaint against Fahad and associated parties. *See Paulson PRV Holdings LLC, et al., v. Fahad Ghaffar, et al.*, 23-cv-1521 (SCC). This complaint alleges a pattern of fraudulent activities, self-dealing, and misrepresentation involving Paulson's Puerto Rican ventures.

[3] On June 10, 2014, Earle purchased parcel #040-039-003-03 for $7,300,000.00 and parcel #040-039-003-09 for $2,700,000.00.

21.    In 2018, already positioned as Paulson & Co.'s top executive in Puerto Rico with near-exclusive access to Mr. Paulson, Fahad and Paulson discussed the possibility of developing the lot at 1149 Ashford Avenue into a luxury condominium.

22.    Per Fahad's sworn testimony, developing a luxury condominium, modeled after Miami's luxury high-rises, had always been his dream.

23.    Aware that he lacked the resources, land ownership, and infrastructure to execute such a project independently, Fahad knew he could only move forward by leveraging Paulson's assets. This opportunistic venture relied entirely on Paulson's financial backing and resources, allowing Fahad to pursue the Project for his own enrichment.

24.    While the idea of developing the lot into luxury condominiums had some promise, Mr. Paulson harbored significant doubts about the project's viability, particularly his concern that the risks associated with a construction project of this magnitude could outweigh its potential return on investment (or "ROI"). Additionally, Paulson was mindful of the inherent uncertainties in the real estate market and feared that any downturn could make it difficult to recoup the substantial upfront investment required for the Project.

25.    Determined to push the Project forward at all costs, Fahad persuaded Mr. Paulson to let him explore the financial feasibility of the development.

26.    After analyzing the financial prospects of the Project and authorizing preliminary efforts, including a land aggregation deed to consolidate the lot acquired by Paulson PRV with an adjacent Paulson PRV property, Fahad was ultimately unable to persuade Paulson to greenlight the Project.

27.    On October 10, 2018, Fahad remarked: "I think this deal is dead".

28.    Specifically, on October 18, 2018, Fahad summarized the financial outlook for development and expressed his belief that it was not worth proceeding with the development.

29.    Based on figures provided by CIC Construction Group, a well-regarded Puerto Rico-based general contractor, construction costs were projected at $200 million, with a potential return on investment capped at $220 million. The Project was also estimated to be substantially completed in 42 months.

30.    The financial projections and timeline turned Mr. Paulson off the development and he decided to shelve the Project.  Fahad did not forget about the lot on 1149 Ashford Avenue.

31.    By 2021, Fahad had become remarkably adept at exploiting his exclusive control over access to Mr. Paulson and the information relayed to him on Paulson & Co.'s Puerto Rico dealings for personal gain. Fahad had also grown increasingly comfortable with misrepresenting facts, omitting key details, and manipulating information to suit his own agenda.

32.    Once again seizing the opportunity to exploit Paulson Puerto Rico's assets for personal gain, Fahad approached Mr. Paulson in January 2021, urging him to revive the Project, citing improved economic conditions.

33.    While Mr. Paulson was initially receptive, he expressed concerns about rising construction costs and potential delays, which made him hesitant to proceed. In response, Fahad—keen to push the Project forward—promised to conduct a thorough evaluation of the Project's financial and economic viability.

34.    Although Fahad maintained the appearance of being deeply involved in the day-to-day operations of Paulson Puerto Rico to keep up appearances with Mr. Paulson, by 2021, he was spending very little time on the island. Instead, he was indulging in an extravagant lifestyle, financed at the company's expense.

35.    To mask his absence and ensure the Project progressed, Fahad enlisted Mr. Rolando Padua ("Padua"), who was, at the time Vice Presidente of Earle, and is now president of Paulson

Puerto Rico, and Ms. Guelmarie Vazquez ("Vazquez"), to oversee the initial steps of the Project and to conduct the financial analysis necessary to move the Project forward.

36.     Mr. Padua supervised the preliminary stages of the Project, including: (1) overseeing design code compliance reviews; (2) submitting applications to the Puerto Rico Department of Consumer Affairs ("DACO") for construction approval; and (3) preparing and filing the required tax credit application under Puerto Rico Act 60.

37.     Ms. Vazquez led efforts to calculate construction costs, using estimates provided by various well-renowned Puerto Rico contractors with vast experience in multi-million commercial and residential developments.

38.     However, Fahad knew these estimates, including CIC's estimate that the construction would cost approximately $200 million, would discourage Mr. Paulson from moving forward.

39.     Fahad, acting by himself and through the agents or employees who were under his control at the time, directed the preparation of a formal presentation based on false and misleading construction estimates to make the Project appear feasible and to set in motion a scheme directed at securing Mr. Paulson's approval for Fahad to coinvest in the Project.

40.     Specifically, Fahad directed his underlings to ignore CIC's estimate, which was prepared three years before, and ordered them to prepare another budget. When he received the budget, he was not satisfied. He knew Mr. Paulson would not greenlight the Project with those figures.

41.     Fahad then directed his underlings to deflate the projected construction costs by 10%, a material sum when considering the magnitude of this project and the ramifications of these types of miscalculations on the overall well-being of the Project and devised a highly speculative

financing structure that relied on unrealistic assumptions, including (a) the sale of 50% of the Project's units before ground break, and (b) the sale of 10% of Earle's Tax Credits at ground break.

42.    The 10% budget reduction was not based on any reasonable estimate of business performance or cost reduction. It was a deliberate measure designed to falsely portray to Mr. Paulson that the development of the Vanderbilt Residences would require lower out-of-pocket investments, thus giving a materially false impression of a higher return on investment.

43.    Fahad was fully aware that, because the forecasted financing structure relied upon the truth of the projected budget, which he knew to be false, the Project would most likely require additional capital contributions further down the road when Earle ran out of cash. This did not bother him. He only needed to get his foot in the door.

44.    On March 21, 2021, Fahad presented the artificial figures and speculative financing scenario of the Project to Mr. Paulson in an in-person meeting. During that meeting, Fahad made intentional and material misrepresentations regarding the Project that were designed to induce Mr. Paulson to allow the Project to move forward and were also designed to obtain Mr. Paulson's approval for Fahad to invest cash in the Project in exchange for an economic interest in the Project's profits or losses.

45.     Specifically, during that meeting, Fahad falsely represented to Mr. Paulson 1) that the Project would cost $178 million, a figure that was drastically different from CIC's projections and 2) that the Project would be substantially completed in 34 months.

46.    Fahad knowingly made these misrepresentations with the improper motive of fraudulently inducing Mr. Paulson to approve the commencement of the Project.

47.    During the meeting, Mr. Paulson listened with open ears and reasonably relied on what Fahad was presenting to him, understandably assuming that the figures and projections being

discussed by his highest-ranking Puerto Rico-based employee were true. It never crossed Mr. Paulson's mind that Fahad was deliberately defrauding him.

48.    Relying on these false representations regarding costs, potential returns and timeline of completion, Mr. Paulson greenlit the TVR project. This was the first step in Fahad's scheme to coinvest in the Project.

### Fahad's $158 Million Mirage

49.    In or around April 2022, Fahad again fraudulently misrepresented the Project's financial projections.

50.    In a conversation with Mr. Paulson, held over the telephone, Fahad falsely claimed that he could further reduce the cost of the Project, down to $158 million.

51.    Fahad knew he had already presented a false projection of costs to Mr. Paulson during their March 2021 meeting.

52.    Fahad knew his assurance that he could further reduce the budget to $158 million was false, yet he insisted on the truth of this statement during this conversation with Mr. Paulson.

53.    Relying on these intentionally altered figures, Fahad falsely assured Mr. Paulson that 93% of the projected costs would be covered by deposits from buyers of the residential units and income from the sale of certain tax credits. Fahad knowingly misrepresented the fact that, based on these figures, completing construction would only require a cash contribution of the remaining 7%, or $11 million.

54.    During that conversation, in or around April 2022, Fahad knowingly and intentionally misrepresented to Paulson that a $11 million cash injection was all that would have to come out-of-pocket to complete construction in order to open the door to contribute that amount using his personal funds, thus inserting himself into the Project as a co-investor.

55.     To that end, Fahad offered to personally invest the additional $11 million needed. Convinced by these false projections and enticed by the prospect of minimizing additional capital outlay, Mr. Paulson was ultimately persuaded to allow Fahad to invest.

56.     Up until that point, Mr. Paulson, through Paulson PRV, invested approximately $14 million in capital contributions to the TVR project, including $10 million for the land purchase, $1 million for the demolition of the existing structure, and an estimated additional $3 million in permits, design, and other preparatory expenses.

57.     Therefore, after Fahad's $11 million investment, the total capital contributions to the Project would total $25 million dollars, 56% invested by Paulson PRV and 44% by Fahad.

58.     Mr. Paulson would have never allowed Fahad to invest in the Project had he known that Fahad had orchestrated this scheme to defraud him by presenting false cost projections to ultimately present a financing structure that placed him in a position to supply the necessary investment to move the Project forward.

### The Agreement to Agree

59.     Fahad elected to make his $11 million investment in Earle through BPR, commencing on April 18, 2022 with his first disbursement of funds.

60.     In consideration of Fahad's investment in Earle, Paulson PRV and BPR agreed to discuss and negotiate in good faith regarding the possibility of admitting BPR as a member of Earle.

61.     Paulson PRV and BPR agreed that the admission would not occur until the execution of an Amended and Restated Operating Agreement that included the essential terms and conditions that would govern the relationship between the two proposed members.

62.     To that end, until the parties perfected an agreement on BPR's admission as a member of Earle, BPR would hold a 44% economic interest in Earle's profits and losses.

63.    However, despite fulfilling this financial commitment, the anticipated negotiations to finalize BPR's membership in Earle stalled, leaving several material terms unresolved. As a result, BPR has not been admitted by Paulson PRV as a member of Earle.

64.    Nevertheless, Paulson PRV has at all times honored BPR's investment and recognizes that it holds a 44% economic interest in Earle, entitling BPR to a 44% share in the company's profits and losses.

65.    The matter of BPR's membership in Earle is being litigated in the Court of First Instance, San Juan Superior Court, in the case of *Better Puerto Rico LLC v. Earle HC LLC*, et al., SJ2024CV00261.

### *The Project Begins*

66.    Earle began the development and construction of the TVR in 2022. During that year, Fahad, through BPR, made the agreed $11 million capital contribution.

67.    Despite the failure to finalize negotiations to admit BPR as a member—negotiations that continued as late as June 2023—as Paulson Puerto Rico's top executive, Fahad remained in charge of the TVR from 2022 until his removal from all operational responsibilities at Paulson-controlled entities in July 2023.

68.    During his tenure as head of the TVR construction project, Fahad grossly mismanaged the Project and created several perilous situations that Paulson PRV and Earle have since had to remedy.

69.    It is important to reiterate that, throughout his entire tenure, Fahad was fully aware that the cost projections he used to convince Mr. Paulson to (1) approve the TVR project and (2) agree for BPR to make an investment in the Project were false and that he made those false representations with the intention of inducing Paulson to greenlight the Project.

70.    Once the Project began, in a desperate attempt to keep constructions costs at his fraudulently manipulated levels, Fahad cut corners at every opportunity.

71.    For instance, he chose a contractor that did not have the appropriate experience in constructing buildings of the Project's complexity and height to carry out the critical concrete work. The contractor selected by Fahad had never participated in the construction of a building higher than four (4) stories. This decision—which Fahad at the time characterized as a cost-cutting measure—ended up increasing the Project's costs when the contractor had to be replaced by a more experienced and, obviously, more costly contractor.

72.    Fahad created an unrealistic schedule for the concrete phase of construction based on the limited experience of the contractor he selected. The projected timeline for earthworks was underestimated by 3 months, foundations by 5.6 months, concrete tiles by 6.8 months, and interior works by 2 months.

73.    Moreover, the geological studies commissioned by Fahad proved deficient, failing to identify an old gas tank on the site, which not only delayed the construction process but also led to a dangerous incident during the groundbreaking, when the gas tank exploded, further complicating the development and adding to the Project's setbacks.

74.    Additionally, supply chain issues emerged due to Fahad's decision to rely on a single supplier for iron rods (rebar), further complicating the construction process. Other mistakes included delays in concrete pouring, design changes, and a consistent failure to ensure that the necessary drawings were received on time, all of which contributed to substantial setbacks for the Project.

### *Fahad's Termination*

75.    On July 31, 2023, Paulson PRV exercised its authority as Earle's sole member and removed Fahad from his position in Earle.

76.    After Fahad was terminated, Mr. Padua, who had been excluded by Fahad from any involvement in the construction after he was tasked with the initial steps needed to kickstart the Project, was brought in, along with Ms. Vázquez, to assess the status of the TVR.

77.    To their dismay, they discovered that the development was in complete disarray, over budget and significantly delayed, and that there was virtually no hope of meeting the construction timeline that had been projected. This posed a significant problem, as a substantial portion of the Project's budget is being funded by deposits from buyers of the condominium units, each of whom was required to provide a 50% deposit.

78.    Earle remedied the situation and the Project now has a very positive outlook, but curing Fahad's managerial gaffes proved costly and time consuming. The additional capital needed to cure Fahad's mismanagement and to account for his fraudulent misrepresentations regarding projected costs is estimated at $51,000,000.00.

79.    One of the first measures taken after being appointed as an officer of Earle, Rafael Cedeño, Executive Vice President of Paulson Puerto Rico, designated CIC, which as alleged earlier, is one of the most respected and renowned contractors in Puerto Rico, to lead the day-to-day construction.

80.    AG Structures, a contractor expert in high-rise concrete constructions, is also providing support to the Project.

81.    Thankfully, Earle's Project is on track to be substantially completed on time and the Project will contribute more than $389 million to Puerto Rico's economy through production. Additionally, the Project is expected to generate approximately 2,408 jobs, which will in turn add more than $127 million in wages, none of which would have been possible under Fahad's direction.

82.    The Project, however, requires additional capital injections that were not currently contemplated when Fahad presented the idea to Mr. Paulson. These capital injections are estimated at $51,000,000.00. These cash shortfalls were directly caused by Fahad grossly and falsely misrepresenting the true costs of the Project and using those false costs to assure Mr. Paulson that the Project would only need BPR's $11 million investment to fund its completion. These statements proved to be false.

83.    Nevertheless, there is no doubt that Mr. Paulson and Paulson PRV were induced to move forward with the TVR project based on the false representations and manipulated financial projections provided by Fahad. His deliberate misrepresentations regarding the project's costs, timeline, and potential return on investment led Mr. Paulson to approve the Project and allow BPR to invest under false pretenses.

[Intentionally left blank]

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION: SECURITIES FRAUD (15 U.S.C. §78(j)(b) and 17 C.F.R. 240.10b-5)
**By: Paulson PRV**
**Against: Fahad and BPR**

84.    The allegations in paragraphs 1 to 83 are hereby re-alleged as if fully incorporated herein.

85.    Section 10(b) of the Exchange makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

86.    The Securities Exchange Commission has promulgated such a regulation, making it illegal to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b).

87.    A successful securities fraud complaint will allege the following six elements: "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460-61 (2013) (citation omitted).

88.    In or around April 2022, Fahad convinced Mr. Paulson to allow him to invest $11 million in Earle, resulting in BPR's acquisition of a 44% economic interest in the company from Earle.

89.    BPR's 44% economic stake in Earle is a security.

90.    Fahad convinced Mr. Paulson to allow his purchase of a stake in Earle by deliberately misrepresenting the financial projections of the TVR.

91.    As described throughout this Complaint, Fahad knowingly provided false statements regarding the Project's expected costs, construction timeline, and financing structure to induce Mr. Paulson to allow him to purchase a stake from Earle.

92.    To secure (a) PRV's time and capital investment in the Project and (b) Mr. Paulson's authorization for Fahad to become an investor in the Project by purchasing a 44% share in the income, deductions and credits of Earle, Fahad instructed the persons and employees under his direction and control to manipulate the financial data and construction timeline, which he then presented to Paulson PRV and Mr. Paulson in March 2021.

93.    Fahad's material misrepresentations were made with scienter, as he was fully aware that the projections he presented were inaccurate and that the true costs and duration of the Project far exceeded what he represented. His intent was to deceive Mr. Paulson and induce him to approve the investment by BPR.

94.    Fahad's misrepresentations were directly connected to the purchase of BPR's 44% economic interest in Earle, as the fraudulent financial information he provided was the basis upon which Mr. Paulson agreed to the investment.

95.    Mr. Paulson and Paulson PRV justifiably relied on Fahad's misrepresentations as the highest-ranking officer leading the TVR project at the time BPR's investment/contribution of $11 million was approved and accepted.

96.    As a result of Fahad's fraudulent actions, BPR acquired a 44% interest in the income, deductions and credits of Earle.

97.    Had Paulson PRV not been fraudulently induced to allow BPR to purchase a 44% stake from Earle, it would have had a 100% profit interest in Earle.

19

98.     Paulson PRV's reduction from 100% to 56% interest in the income or deductions of Earle has substantially diminished Paulson PRV's returns from the Project.

99.     Fahad's fraudulent misrepresentations were the direct cause of Paulson PRV's economic loss because Paulson PRV would not have approved the TVR project or BPR's investment had the true financial projections been disclosed by Fahad.

100.    Paulson PRV's damages stemming from these fraudulent misrepresentations will be proven at trial but are equal to or greater than the monetary value of BPR's interest in the profits generated by the Project.

## SECOND CAUSE OF ACTION: FRAUD
### By: Paulson PRV
### Against: Fahad and BPR

101.    The allegations in paragraphs 1 to 100 are hereby re-alleged as if fully incorporated herein.

102.    "In order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that a false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff." Microsoft Corp. v. Computer Warehouse, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) (citing Wadsworth, Inc. v. Schwarz–Nin, 951 F.Supp. 314, 323 (D.P.R.1996)).

103.    In March 2021, Fahad deliberately and with intent to defraud represented to Mr. Paulson that the Project's budget was 10% lower than its true forecasted cost and that it would be substantially completed in 34 months.

104.    Fahad knowingly understated both the true costs and the project timeline to fraudulently induce Mr. Paulson and Paulson PRV into approving the Project.

105.    In 2022, Fahad further distorted the financial projections, falsely claiming that he could reduce the overall Project costs to $158 million. This, in order to convince Mr. Paulson to

allow him to invest $11 million in Earle on behalf of BPR, resulting in BPR's acquisition of a 44% economic interest in the company from Earle.

106.    Through BPR's $11 million capital contribution to Earle, Fahad, through BPR, fraudulently acquired an interest of 44% in the income, deductions and credits of Earle, which reduced Paulson PRV's interest in the income, deductions and credits of Earle to 56%.

107.    Mr. Paulson and Paulson PRV reasonably relied on Fahad's misrepresentations, believing them to be true. As a direct result of this reliance, Paulson PRV's economic interest in Earle was reduced from 100% to 56%.

108.    Paulson PRV's reliance on these misrepresentations has caused significant economic harm, as the actual costs and delays of the Project far exceed those represented by Fahad. This has not only jeopardized the financial viability of the Project but also devalued Paulson PRV's remaining interest in Earle.

109.    Fahad's actions were intentional and carried out with the specific purpose of defrauding Mr. Paulson and Paulson PRV, in violation of Puerto Rico law.

110.    Fahad's mismanagement and misrepresentation led to significant delays in the construction and completion of the TVR, causing Paulson PRV's significant damages as sole member of Earle and 56% economic interest holder.

111.    The damages stemming from Fahad's intentional fraudulent misrepresentations and subsequent mismanagement of the Project will be proven at trial, but are equal to or greater than $51,000,000.00, which represents the estimated amount of additional equity necessary to complete the Project, plus the monetary value of BPR's interest in the profits generated by the Project.

**THIRD CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY**
**By: Paulson PRV and Earle**
**Against: Fahad**

112.    The allegations in paragraphs 1 to 111 are hereby re-alleged as if fully incorporated herein.

113.    "Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." Bonner v. Triple-S Management, et al, No. CV 19-1228 (BJM), 2021 WL 5989772, at *2 (D.P.R. Dec. 17, 2021), aff'd sub nom. Bonner v. Triple-S Mgmt. Corp., 68 F.4th 677 (1st Cir. 2023)

114.    It has been recognized, under Puerto Rico law, that directors and officers of a corporation have a fiduciary relationship with the corporation and with the company's stockholders. Epstein v. F. & F. Mortgage Corp., 106 DPR 211 (1977).

115.    Art. 2.03 of the Puerto Rico General Corporation Act of 2009, P.R. Laws Ann. tit. 14, § 3523. States as follows:

> The authority and the powers conferred upon every corporation organized under the laws of the Commonwealth of Puerto Rico or upon the officers or directors thereof, by law or in the certificate of incorporation or instrument with equal force and validity, or in the corporate bylaws, **shall be enjoyed and must be exercised by the corporation or by the officers or directors, as the case may be, <u>in benefit of the stockholders of the corporation and for the prudent conduct of its businesses and affairs, as well as for the furtherance of its objectives and purposes</u>**. (Emphasis added).

116.    Given the fact that they are "managers of other people's businesses," the aforementioned article imposes on officers and directors the obligation to exercise their powers with the best interests of the corporation as their guiding principle. Rivera Sanfeliz v. Jta. Dir. FirstBank, 193 D.P.R. 38, 52 (2015) (citing C.E. Díaz Olivo, Corporaciones, San Juan, Publicaciones Puertorriqueñas, 2005, p. 67).

117.    The aforementioned article establishes the three primary responsibilities that correspond to officers and directors of a corporation. These are: "(1) the obligation to act within the scope of their authority, (2) the duty of diligence, and (3) the duty of loyalty, which in turn "are specifically outlined in Articles 4.03, 4.04, and 4.05 of the law." Id. (citing Díaz Olivo, *op. cit.*, p. 67.)

118.    Article 4.03 of the Corporations Act, P.R. Laws Ann. tit. 14, § 3563, establishes that "[t]he directors and officers shall be bound to dedicate to the affairs of the corporation and to the exercise of their duties the attention and care which in a similar position and under analogous circumstances a responsible and competent director or officer would execute in applying his/her business judgment in good faith."

119.    Article 4.04 of the Corporations Act, P.R. Laws Ann. tit. 14, § 3564, establishes that "[w]henever the directors, officers and majority stockholders have personal interests in matters affecting the corporation, they shall be subject to a duty of loyalty which bounds them to act fairly in relation to corporate issues."

120.    As one of its top executives and managers, Fahad owed fiduciary duties to Paulson PRV and Earle because the entities had deposited their trust in his judgment and good faith to manage their affairs in a way that suited their best interests.

121.    Fahad breached his fiduciary duties to Paulson PRV and Earle by making deliberate misrepresentations regarding the TVR project, including costs, timeline, and return on investment metrics with the sole purpose of personally benefitting from Paulson PRV's and Mr. Paulson's approval of BPR's $11 million contribution.

122.    Fahad's breach of fiduciary duty also included a failure to act in the best interest of Paulson PRV and its shareholders because he knowingly concealed critical information and

manipulated financial reports to induce Mr. Paulson to approve the investment and the transfer of 44% of Paulson PRV's economic interest in Earle to BPR.

123.    Moreover, Fahad's gross mismanagement of the Project while he oversaw it caused Paulson PRV, who is the sole member of Earle and has a 56% share in the Project's profits and losses, significant damages.

124.    Fahad's actions were willful, reckless, and conducted in bad faith, in complete disregard for the fiduciary duties he owed to Paulson PRV.

125.    His conduct was motivated by personal gain at the expense of the company's financial interests.

126.    As a result of Fahad's breach of fiduciary duty, Paulson PRV is entitled to no less than $51,000,000.00 in damages.

## FOURTH CAUSE OF ACTION: CONTRACTUAL FRAUD OR CONTRACTUAL DOLO
**By: Paulson PRV**
**Against: BPR**

127.    The allegations in paragraphs 1 to 126 are hereby re-alleged as if fully incorporated herein.

128.    Under Puerto Rican law, contractual fraud or *dolo* has two fundamental applications. Márquez v. Torres Campos, 111 D.P.R. 854, 863 (1982). Contractual fraud can occur at the moment of contract formation or during the execution of the contract. Pérez Rosa v. Morales Rosado, 172 D.P.R. 216, 229 (2007). The first type of *dolo* renders the contract void due to a lack of genuine consent, as it is obtained through insidious machinations. S.L.G. Ortiz-Alvarado v. Great Am., 182 D.P.R. 48, 63 (2011) (citing Márquez, 111 D.P.R. at 863). This includes deceit, fraud, misrepresentation, undue influence, etc. Márquez, 111 D.P.R. at 863; Cruz v. Autoridad de Fuentes Fluviales, 76 D.P.R. 312, 319-320 (1954).

129.    However, *dolo* does not necessarily result in the annulment of a contract in all circumstances. S.L.G. Ortiz-Alvarado, 182 D.P.R. at 63. For *dolo* to result in the annulment of a contract, it must be severe and not employed by both contracting parties. Id. On the contrary, incidental *dolo* only gives rise to compensation for damages caused. Id. at 64.

130.    In this case, there is no doubt that Defendants committed contractual fraud (*dolo*) in the formation of the verbal agreement through which BPR acquired a 44% economic interest in the income, deductions and credits of Earle. Fahad knowingly misrepresented critical financial details of the TVR project, including understated costs and inflated ROIs, to fraudulently induce Mr. Paulson and Paulson PRV to allow BPR to acquire a 44% economic interest in Earle.

131.    These misrepresentations were made with the intent to deceive and benefit BPR at the expense of Paulson PRV. Fahad's actions constitute severe *dolo*, as they were made with full knowledge of their falsity and directly influenced Paulson PRV's decision to enter into the agreement.

132.    As a direct result of Defendants' *dolo*, Paulson PRV lost 44% of its economic interest in Earle, suffering significant financial harm. Paulson PRV would not have entered into the agreement to negotiate in good faith towards BPR's admission as a member of Earle had it known the true facts that Fahad deliberately concealed.

133.    Consequently, Paulson PRV seeks the annulment of the agreement due to the severe *dolo* committed by Fahad and BPR which results in BPR forfeiting its 44% interest in the profits of the Project, along with any other damages that stem directly from Fahad and BPR's contractual *dolo*.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in its favor in accordance with the facts alleged above and the claims stated, along with the reimbursement of attorney's fees and costs.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via CM/ECF to all appearing parties or their attorneys of record by way of their designated email addresses.

**RESPECTFULLY SUBMITTED** in San Juan, Puerto Rico on November 21, 2024.

**DMR Law**
**Counsel for Plaintiffs**
Capital Center Bldg.
Suite 1101
San Juan, PR 00918
Tel. 787-331-9970

*s/ Maria A. Dominguez*
Maria A. Dominguez
USDC-PR No. 210908
m.dominguez@dmrpr.com

*s/Javier F. Micheo-Marcial*
Javier F. Micheo Marcial
USDC-PR No. 305310
j.micheo@dmrpr.com

*s/ Julián R. Rodríguez-Muñoz*
Julián R. Rodríguez-Muñoz
USDC-PR No. 308301
j.rodriguez@dmrpr.com

*Counsel for Plaintiffs*



PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434
Fax: (787) 523-3433

*s/JUAN J. CASILLAS AYALA*
USDC-PR No. 218312
jcasillas@cstlawpr.com

*s/VICTOR O. ACEVEDO-HERNÁNDEZ*
USDC-PR No. 227813
vacevedo@cstlawpr.com

*s/NATALIA DEL NIDO-RODRÍGUEZ*
USDC-PR No. 301410
ndelnido@cstlawpr.com